IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:18-CV-124-D

DAVID BEAM,                              )
                                         )
                         Plaintiff,      )
                                         )
              v.                         )          **ORDER**
                                         )
SOUTHEASTERN FREIGHT LINES, INC.,        )
                                         )
                         Defendant.      )

David Beam ("Beam" or "plaintiff") alleges that his employer Southeastern Freight Lines,

Inc. ("SEFL" or "defendant") discriminated against him in violation of the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. § 621, et seq., and the American with Disabilities Act

("ADA"), 42 U.S.C. § 12111, et seq. [D.E. 13]. On December 6, 2019, Beam moved for summary

judgment [D.E. 54] and filed a memorandum and statement of facts in support [D.E. 55, 56]. On

December 27, 2019, SEFL responded [D.E. 60, 61]. On January 10, 2020, Beam replied [D.E. 65].

On December 20, 2019, SEFL moved for summary judgment [D.E. 57] and filed a

memorandum and statement of facts in support [D.E. 58, 59]. On January 17, 2020, Beam

responded [D.E. 67, 68]. On the same date, SEFL moved to strike Beam's responses [D.E. 71]. On

January 30, 2020, Beam responded to SEFL's motion to strike [D.E. 74]. On February 13, 2020,

SEFL replied [D.E. 76].

On March 25, 2020, the court referred, inter alia, SEFL's motion to strike to Magistrate Judge

Numbers [D.E. 77]. On April 13, 2020, Magistrate Judge Numbers granted SEFL's motion to strike

[D.E. 78]. On April 23, 2020, Beam appealed Magistrate Judge Numbers's decision [D.E. 79]. On

April 29, 2020, SEFL responded [D.E. 80]. As explained below, the court overrules Beam's

objections, affirms Magistrate Judge Numbers's decision, denies Beam's motion for summary judgment, and grants SEFL's motion for summary judgment.

## I.

On November 13, 1989, Beam began working for SEFL as an inbound supervisor in SEFL's Fayetteville, North Carolina facility. See Beam Dep. Ex. 2 [D.E. 55-1] 280; Beam Dep. [D.E. 55-1] 22–24. Beam was born on October 20, 1960, and he was 29 years old when SEFL hired him. See Beam Dep. at 8. On the same date, SEFL held an orientation for new employees, including Beam, where Beam's direct supervisor, Leggett Lovan, discussed equal employment opportunity at SEFL. See Beam Dep. Ex. 2 at 280; Beam Dep. at 22–23. Beam's responsibilities as inbound supervisor included supervising four pickup and delivery ("P&D") drivers. P&D drivers delivered freight stored at SEFL's Fayetteville facility to local customers. See Beam Dep. at 25. Beam held the inbound supervisor position for approximately one year. See id. at 28.

After one year, Beam became a break bulk supervisor at SEFL's Fayetteville facility. See id. Beam's responsibilities included supervising 15 SEFL associates concerning the consolidation of freight on common loads and the transfer of freight among SEFL's service centers. See id. at 29. Beam served as a break bulk supervisor for approximately 10 years until SEFL moved the break bulk supervisor position to another service center. See id. at 33, 38. After SEFL moved the position, the company asked Beam to serve as a P&D supervisor. See id. As P&D supervisor, Beam's responsibilities included serving as a dispatcher for 21 P&D drivers. See id. at 35.

While Beam worked as P&D supervisor, and until January 2011, Cecil Amerson ("Amerson") was the SEFL Service Center Manager in Fayetteville. See id. at 36; Davis Dep. [D.E. 55-3] 8–9. Amerson documented Beam's performance deficiencies from October 2006 to July 15, 2010, including issues concerning "telxon follow ups," improperly taking telxon credit, negative

interactions with SEFL employees, reducing net hours, failing to take the lead when asked to review telxon reports to plan for an increase in workload, failing to enter cost data on three days, not responding to Amerson's requests, failing to make timely a "therefore" log, leadership issues, and time-management issues. See Beam Dep. at 99–116; Beam Dep. Exs. 12–17 at 304–12. As for Beam's failure to timely complete certain tasks, Amerson stated that "[t]his is the kind of stuff that gets managers and supervisors terminated." Beam Dep. Ex. 17 at 312; see Beam Dep. at 115–16.

SEFL did not have a specific policy concerning supervisor-performance issues. See Beam Dep. at 148–49; Shore Dep. [D.E. 55-2] 37. In evaluating supervisors, SEFL evaluates process data, performance numbers and goals, general leadership skills, and personnel management. See Shore Dep. at 17–18; Shore Dep. Ex. 1 [D.E. 55-2] 156–64; Davis Dep. at 88–89; Davis Dep. Ex. 9 at 250–55. Good performance numbers, alone, are insufficient for "exemplary" performance at SEFL, and do not mean a supervisor is free from other performance issues. See Shore Dep. at 142. Additionally, SEFL administers a "survey, discuss, and implement" process ("SDI") annually to its employees "to determine how engaged they are with their job and how well [SEFL is] leading them." Shore Dep. at 70–71, 112–13. Beam reviewed his SDI scores yearly, and SEFL personnel discussed the scores with him on at least one occasion. See Beam Dep. 71–73, 217–18.

In January 2011, Mark Davis ("Davis") became SEFL Service Center Manager and Beam's direct supervisor in Fayetteville. See Davis Dep. at 8–9. Davis was the same age as Beam, and they got along at the beginning of Davis's tenure. See Beam Dep. at 117, 130. Davis noticed similar performance issues to those Amerson documented concerning Beam. In June 2011, Davis began documenting his observations of Beam's performance that he later shared with Beam, (i.e., "write ups"). See Davis Dep. at 222–23; Beam Dep. Exs. 18–32 at 313–55; Beam Dep. at 126–27. From June 2011 to May 2017, Davis issued fourteen write ups to Beam. See Davis Dep. at 223, 230;

Beam Dep. Exs. 18–24, 26–32 at 313–21, 323–55. After each write up from Davis to Beam, Davis would meet in person with Beam to discuss the issue. Beam did not contest the accuracy of Davis's conclusions contained in the write ups. See Davis Dep. at 223–25; Beam Dep. 140–42. Although Beam did not agree with Davis's conclusions, Beam recognized that Davis identified legitimate business concerns and ways for Beam to improve. See Beam Dep. at 121, 129, 133, 140–42, 167–69, 235–36.

In late 2014, SEFL moved Beam from the P&D supervisor role to the outbound supervisor role. See Beam Dep. at 39–40. In this role, Beam managed four SEFL employees. See id. at 71. Davis made the decision based on Beam's SDI scores that reflected lower employee satisfaction in Beam's division as compared to SEFL as a whole, the write ups and follow-up conversations with Beam, and that the outbound supervisor role required less from Beam. See Davis Dep. at 61–65; Shore Dep. at 113–18; Shore Dep. Ex. 3 at 167–70.

On December 10, 2014, shortly after assuming the outbound supervisor role, Beam went to the hospital because he "thought [he] was having a heart attack." Beam Dep. at 45. Beam remained at the hospital for testing for three days. See id. at 46. Beam was diagnosed with supraventricular tachycardia ("SVT"), a nerve disorder that causes a quickened heart rate. See id. at 45–46. Over the next five months, Beam had four SVT episodes that required him to take approximately 35 minutes away from his work for treatment. Following each episode, Beam returned to work. See id. at 46–51. On one occasion, Davis took Beam to the hospital. See id. at 54–55, 242. On June 18, 2015, Beam underwent cardiac ablation surgery to treat his SVT. See id. at 44, 52. Beam took vacation days for the surgery, and SEFL did not count those days as absences. See id. at 44, 46, 48, 52. When Beam returned to work after the surgery, Beam did not have any work restrictions and continues not to have restrictions. See id. at 52. For continuing treatment, Beam takes medication and has a yearly

4

checkup. See id. at 56. SEFL did not question whether Beam could physically perform his job after the surgery. See id. at 239. After returning from surgery, Beam met with Davis and SEFL Regional Human Resources Manager Tonya Clayton ("Clayton"). They asked "if [Beam] was prepared to move on with [his] job," which Beam understood to be an inquiry into whether he was "fit for the job." Id. at 59–60. Beam responded "yes." Id.

In October 2015, Davis and Davis's direct supervisor, SEFL Regional Vice-President for Region 2 Kim Shore ("Shore"), discussed performance issues they observed concerning Beam's work. See Beam Dep. 159–60; Beam Dep. Ex. 26 at 323; Davis Dep. at 15; Shore Dep. at 5–6, 123–24. During the meeting, Davis noted that Beam "was struggling" as outbound supervisor, a relatively easy position at SEFL. Beam Dep. at 162–63. Beam stated that Davis and Shore should "look at the data and the numbers from [his] shift." Id. at 161. On October 5, 2015, following the meeting, Davis sent Beam a write up listing Davis's concerns about Beam's performance and stating his expectation that Beam improve. See Beam Dep. Ex. 26 at 323.

On April 1, 2016, Davis sent Beam another write up. See Beam Dep. at 166–69; Beam Dep. Ex. 27 at 324. In the write up, Davis identified six performance issues and noted that, when talking to Beam concerning the performance issues, "either [Beam was] not listening or [he was] ignoring [Davis]." Beam Dep. Ex. 27 at 324. On April 7, 2016, Davis sent Beam a write up concerning Beam's failure to make sure part-time employees did not work beyond the maximum number of hours permitted. See Beam Dep. at 171; Beam Dep. Ex. 28 at 325. Davis and Shore sent Beam to Charlotte for a one-week SEFL outbound operations training to improve his performance, and Beam thought the training beneficial. See Beam Dep. at 202, 204, 206, 209; Shore Dep. at 30.

On December 2, 2016, Davis issued Beam a write up concerning his failure to properly code a shipment that resulted in a delivery failure to one of SEFL Fayetteville's biggest customers.

5

See Beam Dep. 172–73; Beam Dep. Ex. 29 at 326. On January 23, 2017, Davis issued Beam a write up concerning ten work-performance issues. See Beam Dep. 173–74; Beam Dep. Ex. 30 at 327. On May 15, 2017, Davis issued Beam a write up concerning work-performance issues and Beam's failure to conduct "quality activities" through March 13, 2017. See Beam Dep. 183–84; Beam Dep. Ex. 31 at 337. SEFL "quality activities" are written submissions SEFL employees make on behalf of other employees that recognize that employee for "doing the right thing." Beam Dep. at 184–85. Beam acknowledged that he had not conducted any quality activities, but stated that he did provide food and drinks for employees on occasion. See Beam Dep. at 185–87. On May 1, 2017, Davis issued Beam a write up concerning various performance issues, many of which Davis had addressed with Beam in previous write ups. See id. at 193; Beam Dep. Ex. 32 at 350.

Beam maintained that if his performance numbers were meeting his objectives, he was "valuing" his employees "completely and [the employees were] returning the value to get those kind of . . . numbers." Beam Dep. at 245–46. Moreover, the SEFL teams Beam supervised achieved "platinum" results in several delivery processes, and those results were some of the best at SEFL. See Shore Dep. at 75–77; Davis Dep. at 138–39; Davis Dep. Ex. 21 at 273. SEFL considers a process "platinum" if it meets standards the company sets. See Shore Dep. at 75–77; Davis Dep. at 131. Davis testified that he did not think Beam could have achieved his performance numbers had Davis not issued each write up. See Davis Dep. at 227. Additionally, Davis spent considerable time reviewing Beam's work to make sure Beam completed it properly. See Shore Dep. at 125–26.

In June 2017, Shore and Davis approached Clayton concerning demoting Beam to a non-supervisory role. See Shore Dep. at 88; Davis Dep. at 147; Clayton Dec. [D.E. 59-1] ¶¶ 11, 16. Shore thought Davis had provided Beam ample opportunity to address work-performance issues and to improve in the areas Davis identified, and did not doubt Davis's assessment of Beam's

performance. See Shore Dep. at 132–34. Clayton drafted an "investigation document" recounting efforts to improve Beam's performance and attaching supporting documents (i.e., the write ups). See Clayton Dec. at ¶¶ 13–14; Shore Dep. at 126–27; Shore Dep. Ex. 4 at 171–205. The investigation document was part of Shore's and Davis's request that SEFL demote Beam to a freight handler position, or if he did not accept that position, to terminate Beam's employment. See Clayton Dec. at ¶¶ 13–14; Shore Dep. at 127. Davis and Shore approved the investigation document and recommendation before Clayton submitted it. See Shore Dep. at 127. Shore and Davis did not discuss Beam's age when considering the recommendation. See id. at 148.

On June 12, 2017, Davis and Shore met with Beam. Shore told Beam that they did not think Beam could continue in a leadership position at SEFL, but hoped he would stay on as a freight handler because they believed he could be successful in that position. See Beam Dep. at 212–15; Shore Dep. at 83–84. Beam asked if they could review the performance data, but they did not review it during the meeting. See Beam Dep. at 214, 220; Shore Dep. at 153. Beam accepted the demotion to freight handler and arrived for work the following day. See Beam Dep. at 246.

SEFL temporarily named David Creel, an employee in his forties, as Beam's replacement as outbound supervisor. See id.; Shore Dep. at 86. SEFL then hired Andrew Sears, an employee between age thirty and forty, as outbound supervisor. See Davis Dep. at 144–45.

## II.

Beam appeals Magistrate Judge Numbers's order striking Beam's response in opposition to SEFL's summary judgment motion and response to SEFL's statement of material facts. See [D.E. 79]. In the order, Magistrate Judge Numbers found that Beam filed his response memorandum and responsive statement of material facts seven days after the court-ordered deadline because he mis-calendared the due date, and that Beam did not timely file for an extension. See Order [D.E. 78] 3.

The court found Beam's behavior did not qualify as excusable neglect under Fourth Circuit precedent, and Beam failed to demonstrate extraordinary circumstances for his late filings. See id. at 3–5.

This court can modify or set aside a magistrate judge's order if the order is "clearly erroneous" or "contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). "The Federal Magistrates Act requires a district court to make a de novo determination of those portions of the magistrate judge's report or specified proposed findings or recommendations to which objection is made." Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005) (emphasis, alteration, and quotation omitted); see 28 U.S.C. § 636(b)(1). Absent a timely objection, "a district court need not conduct a de novo review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Diamond, 416 F.3d at 315 (quotation omitted).

Beam's appellate memorandum regurgitates, word for word, the arguments made in his response to SEFL's motion to strike. Compare [D.E. 79] with [D.E. 74]. Thus, Beam makes no effort to persuade the court that Magistrate Judge Numbers's order is contrary to law or clearly erroneous. Rightly so. It is not. See Order at 5. Accordingly, the court affirms Magistrate Judge Numbers's order striking Beam's response in opposition to SEFL's summary judgment motion and response to SEFL's statement of material facts.

III.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must

initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

## A.

As for the cross motions for summary judgment concerning Beam's ADEA claim, the ADEA prohibits an employer from "fail[ing] or refus[ing] to hire or to discharge any individual or otherwise

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff may establish an ADEA claim in two ways. First, an employee may produce direct evidence showing that an employer's conduct was motivated by age discrimination. See, e.g., Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177–78 (2009); Westmoreland v. TWC Admin. LLC, 924 F.3d 718, 725 (4th Cir. 2019); Mereish v. Walker, 359 F.3d 330, 334 (4th Cir. 2004). Second, an employee may proceed under the burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973). See Westmoreland, 924 F.3d at 725–26; Mereish, 359 F.3d at 334; Smith v. Flax, 618 F.2d 1062, 1066–67 (4th Cir. 1980).

The McDonnell Douglas framework includes three steps: "(1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." Guessous v. Fairview Prop. Invs. LLC, 828 F.3d 208, 216 (4th Cir. 2016). The McDonnell Douglas framework applies to age discrimination claims under the ADEA. See, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141–42 (2000); O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 310–13 (1996); Westmoreland, 924 F.3d at 725; Laber v. Harvey, 438 F.3d 404, 430 (4th Cir. 2006) (en banc).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the adverse employment action was "for a legitimate, nondiscriminatory reason." Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 254 (1981). This burden is one of production, not persuasion. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–11 (1993); Westmoreland, 924

10

F.3d at 725. If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc) (quotation omitted), abrogated on other grounds by 557 U.S. 169 (2009); see, e.g., Reeves, 530 U.S. at 143; Westmoreland, 924 F.3d at 726; King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003). A plaintiff can do so by showing that the employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." Mereish, 359 F.3d at 336 (quotation omitted); see Reeves, 530 U.S. at 147.

To establish a prima facie case of disparate treatment under the ADEA, a plaintiff must show that (1) he was a member of the protected class, i.e., "individuals who are at least 40 years of age," 29 U.S.C. § 631(a); (2) he was meeting his employer's legitimate expectations at the time of the adverse employment action; (3) the employer took adverse employment action against him; and (4) the employer took that adverse employment action under circumstances giving rise to an inference of age discrimination. See O'Connor, 517 U.S. at 310–13; Hill, 354 F.3d at 285; Howard v. Coll. of the Albemarle, 262 F. Supp. 3d 322, 335 (E.D.N.C. 2017), aff'd, 697 F. App'x 257 (4th Cir. 2017) (per curiam) (unpublished); Wood v. Town of Warsaw, 914 F. Supp. 2d 735, 739–40 (E.D.N.C. 2012).

The parties agree that Beam was 56 years old and in the protected class at the time of his demotion, that his demotion was an adverse employment action, and that SEFL replaced him with two employees, David Creel and Andrew Sears, the latter of whom was not in the protected class. See Shore Dep. at 86; [D.E. 55] 7–10; [D.E. 60]. The parties disagree about whether Beam was

meeting SEFL's legitimate expectations. See [D.E. 55] 8–9; [D.E.60].[1]

An employee's perception of his own performance cannot establish that he was meeting his employer's legitimate expectations. Rather, the employer's perception controls. See, e.g., King, 328 F.3d at 149; Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000); Flax, 618 F.2d at 1067. Even though a plaintiff may contest the factual accuracy of an employer's critiques, the issue is whether the employer, the decisionmaker, believed the critiques to be true. See Holland v. Wash. Homes, Inc., 487 F.3d 208, 215–17 (4th Cir. 2007); Hill, 354 F.3d at 293–94. Additionally, opinion evidence of coworkers concerning plaintiff's performance does not create a genuine issue of material fact as to whether plaintiff was meeting his employer's legitimate expectations. See King, 328 F.3d at 149; Hawkins, 203 F.3d at 280. Moreover, the court does "not sit as a super-personnel department weighing the prudence of employment decisions." Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005) (quotation omitted). An employer can set its own performance standards so long as "such standards are not a 'mask' for discrimination." Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir. 1997), abrogated on other grounds by Gilliam v. S.C. Dep't of Juvenile Justice, 474 F.3d 134 (4th Cir. 2007); McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp. 2d 595, 607 (E.D.N.C. 2006).

Viewing the evidence in a light most favorable to Beam, no rational jury could find that Beam was meeting SEFL's legitimate expectations. Amerson, Beam's direct supervisor before Davis, issued numerous "write ups" concerning Beam's lack of responsiveness, his inattention to detail, and his lack of initiative. See Beam Dep. at 99–116; Beam Dep. Exs. 12–17 at 304–12. Davis issued fourteen write ups to Beam concerning the issues Amerson identified. See Davis Dep.

---

[1] Beam includes several facts in his memorandum that he does not include in his statement of material facts. Compare [D.E. 55] with [D.E. 56].

at 223, 230; Beam Dep. Exs. 18–24, 26–32 at 313–21, 323–55. Based on the write ups and Beam's poor SDI scores, Davis and Shore removed Beam as P&D supervisor and placed him as outbound supervisor in 2014. See Davis Dep. at 61–65; Shore Dep. at 113–18; Shore Dep. Ex. 3 at 167–70. Even in the "relatively easy role" of outbound supervisor, Davis and Shore continued to document Beam's various performance issues. See Beam Dep. 159–60, 162–63; Beam Dep. Ex. 26 at 323; Davis Dep. at 150; Shore Dep. at 5–6, 129–30. Although Beam's interpretation of his performance via SEFL's data metrics led him to believe that his performance was adequate, his perception does not create a genuine issue of material fact concerning whether he was meeting SEFL's legitimate expectations. See, e.g., King, 328 F.3d at 149; Hawkins, 203 F.3d at 280; Flax, 618 F.2d at 1067. He was not. Accordingly, the court grants summary judgment to SEFL concerning Beam's ADEA claim and denies summary judgment to Beam.

Alternatively, even assuming that Beam can demonstrate a prima facie case of age discrimination, his claim fails because SEFL articulates a legitimate, nondiscriminatory reason for demoting Beam—his poor performance—and no rational jury could find that, but for his age, SEFL would not have demoted Beam from a supervisor position. See Gross, 557 U.S. at 180; Reeves, 530 U.S. at 141–42; Gentry v. E. W. Partners Club Mgmt. Co., 816 F.3d 228, 234 (4th Cir. 2016); Equal Emp. Opportunity Comm'n v. Balt. Cty., 747 F.3d 267, 273 (4th Cir. 2014); Wood, 914 F. Supp. 2d at 740. SEFL thoroughly documented Beam's numerous performance problems, and Davis and Shore discussed those issues with Clayton when proposing to demote Beam. Age was not discussed. See Shore Dep. at 148. Moreover, the record does not contain any evidence from which a factfinder could infer that age factored into SEFL's decision to demote Beam. See, e.g., Duffy v. Belk, Inc. 477 F. App'x 91, 96–97 (4th Cir. 2012) (unpublished).

In analyzing pretext, the "crucial issue" is whether "an unlawful discriminatory motive for a defendant's [conduct] exists, not the wisdom or folly of its business judgment." Jiminez v. Mary Washington Coll., 57 F.3d 369, 383 (4th Cir. 1995). Plaintiff's speculation about pretext is not enough. See, e.g., Holland, 487 F.3d at 216–18; Mereish, 359 F.3d at 336–39; Hawkins, 203 F.3d at 280–81. "It is not . . . the function of this court to second guess the wisdom of business decisions." E.E.O.C. v. Clay Printing Co., 955 F.2d 936, 946 (4th Cir. 1992); see Mereish, 359 F.3d at 339. "Duty-bound though we are to examine employment decisions for unlawful discrimination, we are not cloaked with authority to strip employers of their basic responsibilities." Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006). Accordingly, in light of the record and governing law, the court grants summary judgment to SEFL concerning Beam's ADEA claim and denies summary judgment to Beam.

## B.

As for SEFL's motion for summary judgment concerning Beam's ADA claim, to establish a prima facie case, Beam must "produce evidence sufficient to demonstrate that (1) he was a qualified individual with a disability; (2) he was discharged; (3) he was fulfilling his employer's legitimate expectations at the time of discharge; and (4) the circumstances of his discharge raise a reasonable inference of unlawful discrimination." Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012) (alterations and quotations omitted); Rohan v. Networks Presentations LLC, 375 F.3d 266, 272 n.9 (4th Cir. 2004); Rhoads v. F.D.I.C., 257 F.3d 373, 387 n.11 (4th Cir. 2001); Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir. 2001); Howard, 262 F. Supp. 3d at 334; Rocha v. Coastal Carolina Neuropsychiatric Crisis Servs., 979 F. Supp. 2d 670, 677

14

(E.D.N.C. 2013).[2]

SEFL argues that Beam was not disabled.  See [D.E. 58] 19–21.  The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))."  42 U.S.C. § 12102(1); see 29 C.F.R. §§ 1630.2(g)(l)–(2).  A disability "substantially limits" a major life activity if "it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii); Rhoads, 257 F.3d at 387.  A major life activity, in turn, "refers to those activities that are of central importance to daily life, including walking, seeing, hearing, and manual tasks . . . ." Wilson, 513 F.3d at 385 (quotations omitted); see 29 C.F.R. § 1630.2(i); A Helping Hand, LLC v. Balt. Cty., 515 F.3d 356, 367 (4th Cir. 2008); Rohan, 375 F.3d at 274; Rhoads, 257 F.3d at 387.

As for a "regarded as" claim, section 12102(3) states:

For purposes of paragraph (1)(C):

(A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

(B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

---

[2] Although this order includes citations to cases applying the ADA before the ADA Amendment Act of 2008 ("ADAAA"), the court has applied the ADAAA to Beams's ADA claim. See, e.g., 42 U.S.C. § 12102(3); 29 C.F.R. § 1630.2(l)(1); Olsen v. Cap. Region Med. Ctr., 713 F.3d 1149, 1154 (8th Cir. 2013); Boitnott v. Corning, Inc., 669 F.3d 172, 174–75 & n.3, 4 (4th Cir. 2012).

42 U.S.C. § 12102(3). Under section 12102(3), which Congress added in the ADAAA, an individual bringing a "regarded as" claim need only show that an employer subjected him to an action the ADA prohibits because of an actual or perceived impairment regardless of whether the employer perceived the impairment to limit the individual in a major life activity. See 42 U.S.C. § 12102(3); 29 C.F.R. § 1630.2(l)(1); Fauconier v. Clark, No. 18-6489, 2020 WL 4046025, at *6 (4th Cir. July 20, 2020); Olsen, 713 F.3d at 1154; see also Gecewicz v. Henry Ford Macomb Hosp. Corp., 683 F.3d 316, 321–23 (6th Cir. 2012). Thus, a "regarded as" claim under the ADAAA is much easier to prove than a "regarded as" claim before the ADAAA. See Summers v. Altarum Inst., Corp., 740 F.3d 325, 332 (4th Cir. 2014); cf. Young v. United Parcel Serv., 707 F.3d 437, 443–44 (4th Cir. 2013) amended by 748 F.3d 192 (4th Cir. 2015) (analyzing a pre-ADAAA "regarded as" claim); Rohan, 375 F.3d at 277–78 (same); Pollard v. High's of Balt., Inc., 281 F.3d 462, 471 n.5 (4th Cir. 2002) (same); Davis v. Univ. of N.C., 263 F.3d 95, 99–100 (4th Cir. 2001) (same); Rhoads, 257 F.3d at 390–91 (same); Haulbrook, 252 F.3d at 703 (same).

For a "regarded as" claim, the court focuses "on the reactions and perceptions of the employer's decisionmakers who worked with the employee." Wilson v. Phoenix Specialty Mfg. Co., 513 F.3d 378, 385 (4th Cir. 2008) (quotation and alteration omitted). To that end, "[t]he fact that an employer is aware of an employee's impairment, without more, is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action." Haulbrook, 252 F.3d at 703 (quotation omitted); Knight v. McCarthy, 439 F. Supp. 3d 744, 760 (E.D. Va. 2020).

Even viewing the evidence in a light most favorable to Beam, no rational jury could find that he was disabled under section 12102(1)(A) or section 12102(1)(B). On the contrary, Beam testified that after he had surgery to correct his SVT condition in June 2015, he has not had another episode

of increased heart rate requiring medical attention, and does his job without restrictions. See Beam Dep. at 52, 56. Although Beam testified that he was taking medication and seeing a doctor two or three times yearly concerning SVT at the time he was demoted, there is no evidence that SVT limited any of Beam's major life activities. See 29 C.F.R. §§ 1630.2(i), (j)(1)(ii); A Helping Hand, LLC, 515 F.3d at 367; Rohan, 375 F.3d at 274; Rhoads, 257 F.3d at 387. Accordingly, Beam is not disabled under section 12102(1)(A) or a person with a record of disability under section 12102(1)(B).

Additionally, SEFL did not regard Beam as disabled for purposes of section 12102(1)(C). Beam's perception of Clayton and Davis's comment concerning whether Beam was "fit" to work after returning from surgery does not create a jury issue. See Wilson, 513 F.3d at 385. That comment demonstrates, at most, that Davis and Clayton were aware of Beam's surgery and SVT condition. Beam, however, cannot rely solely on SEFL's knowledge of his SVT condition to support his ADA claims. See Haulbrook, 252 F.3d at 703; Knight, 439 F. Supp. 3d at 760. Moreover, nothing in the record connects that comment with Davis's, Clayton's, and Shore's decision to demote Beam almost two years after making the inquiry. Any such connection is speculative. See Matsushita, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)); Beale, 769 F.2d at 214; Hux, 451 F.3d at 315. Accordingly, the court grants SEFL's motion for summary judgment concerning Beam's ADA claim.

Alternatively, even viewing the evidence in a light most favorable to Beam, no rational jury could find that Beam was fulfilling SEFL's legitimate expectations when SEFL demoted him. As discussed, he was not. Accordingly, Beam has failed to establish a prima facie case under the ADA, and the court grants summary judgment to SEFL on Beam's ADA claim. See Reynolds, 701 F.3d at 150 ; Rohan, 375 F.3d at 272 n.9; Rhoads, 257 F.3d at 387 n.11; Haulbrook, 252 F.3d at 702;

17

Howard, 262 F. Supp. 3d at 334; Rocha, 979 F. Supp. 2d at 677.

## IV.

In sum, the court AFFIRMS Magistrate Judge Numbers's decision, OVERRULES plaintiff's objections [D.E. 79], GRANTS defendant's motion for summary judgment [D.E. 57], and DENIES plaintiff's motion for summary judgment [D.E. 54]. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This ⎵9 day of August 2020.

JAMES C. DEVER III
United States District Judge